## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRUCE LEVINE AND** | ) | |
| **DANIEL MCCORKLE and GARY and** | ) | **CLASS ACTION** |
| **CAROLYN SINGER on behalf of** | ) | |
| **themselves and all others similarly** | ) | **CIVIL ACTION NO.:** |
| **situated,** | ) | **09-842-JHS** |
| | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | |
| | ) | |
| **FIRST AMERICAN TITLE** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT
## <u>OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

# TABLE CONTENTS

I.     INTRODUCTION ................................................................................................ 1

     A.    Identification of Class Members ........................................................... 3

II.    STATEMENT OF FACTS ................................................................................ 9

     A.    The Nature of Title Insurance ............................................................. 9

     B.    How First American Sells Title Insurance in Pennsylvania ................... 9

     C.    The Statutory Regulation of Title Insurance Premiums ....................... 10

     D.    Defendant's Databases ....................................................................... 12

     E.    First American Overcharged Plaintiffs and the Members of the Class ............... 12

III.   ARGUMENT ................................................................................................... 13

     A.    The Standards Governing Class Certification Under Fed. R. Civ. P. 23 ............. 13

     B.    The Class Is Readily Ascertainable, And The Requirements Of Rule 23(A) Are Readily Met ................................................................................... 14

     C.    Plaintiffs Meet All Of The Requirements Of  Rule 23(a) ..................... 15

           1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable ........................................................................... 16

           2.    There Are Questions Of Law And Fact Common To The Class ............. 16

           3.    Plaintiffs' Claims Are Typical Of The Claims Of The Class .................. 20

           4.    Plaintiff Will Fairly And Adequately Protect The Interests Of The Class 21

     D.    All of the Requirements of  Rule 23(b)(3) are met. ............................. 23

           1.    Common issues predominate .................................................. 23

                a.    Common Issues Predominate under RICO .................................. 25

                b.    Common issues predominate under the UTPCPL ........................ 28

           2.    The Class Action Device Is The Superior Method To Adjudicate This Controversy ..................................................................... 30

     A.    This Case is Similar to Other Title Insurance Overcharge Cases that Have Been Certified ......................................................................... 32

i

B.     This Case is Distinguishable from Title Insurance Cases in in Which Certification Has Been Denied ................................................................................................. 33

C.     The Court Should Appoint Proposed Class Counsel. ........................................... 35

IV.    CONCLUSION ............................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alberton v. Commonwealth Land Title Ins. Co.*,
299 F.R.D. 109 (E.D. Pa. 2014).............................................................35

*Alexander v. Coast Prof'l Inc.*,
No. CIV.A. 12-1461, 2014 WL 4413598 (E.D. Pa. Sept. 5, 2014), *appeal dismissed*
(Dec. 17, 2014) ..................................................................... passim

*Allen v. Holiday Universal*,
249 F.R.D. 166 (E.D. Pa. 2008).............................................................30

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (U.S. 2013) ("*Amgen*") ..........................................13, 24

*Baum v. Keystone Mercy Health Plan*,
No. 2677 EDA 2013 (Pa. Super. Dec. 9, 2014) ..............................30, 35

*Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*,
40 A.3d 145.........................................................................................30

*Boucher v. First American Title Insurance Co.*,
2012 WL 3023316 (W.D. Wash. May 2, 2011)....................................34

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639, 128 S.Ct. 2131 (2008)....................................................28

*Cave v. Saxon Mortgage Servs., Inc.*,
No. CIV.A. 11-4586, 2013 WL 460082 (E.D. Pa. Feb. 6, 2013) ..........31

*CGC Holding Co., LLC v. Broad and Cassel*,
No. 13-1255, 2014 WL 6872148 (10th Cir. Dec. 8, 2014)..........26, 27, 28

*Coleman v. Commonwealth Land Title Insurance Co.*,
684 F.Supp.2d 595 (E.D. Pa. 2010) ...................................................5, 6

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (U.S. 2013)..................................................................14

*Corwin v. Lawyers Title Ins. Co.*,
276 F.R.D. 484 (E.D. Mich. 2011) .......................................................34

iii

*Dubin v. Sec. Union Title Ins. Co.*,
  832 N.E.2d 815 (Ohio Ct. App. 2005) ...................................................................33

*Grimes v. Enterprise Leasing Co. of Phila., LLC*, 66 A.3d 330, 337 n.4 (Pa. Super. 2013),
  *reversed on other grounds, Grimes v. Enter. Leasing Co. of Philadelphia*, LLC, No. 4
  MAP 2014, 2014 WL 7088933 (Pa. Dec. 15, 2014) ...............................................30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (U.S. 2014) ....................................................................................24

*Haskins v. First American Title Ins. Co.*,
  No. CIV. 10-5044 .............................................................................................34, 35

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) ..............................................................................14, 19

*Himmelreich v. Adams Abstract Assoc.*,
  59 Pa. D & C 4th 382 (Com. Pl. Ct. 2002) ............................................................29

*In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*,
  263 F.R.D. 226 (E.D. Pa. 2009) .............................................................................23

*In re Coordinated Title Ins. Cases*,
  784 N.Y. Sup. 2004 .................................................................................................33

*In re Coordinated Title Ins. Cases*,
  No. 010764/2002, 2 Misc.3d 1007(A), 2004 WL 690380 (N.Y.Sup.Ct. Jan. 8, 2004) ...........27

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ....................................................................................13

*In re Pet Food Prods. Liability Litig.*,
  629 F.3d 333 (3d Cir. 2010) ....................................................................................23

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ........................................................................16, 22, 25

*In re U.S. Foodservice, Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) *cert. denied sub nom. US Foods, Inc. v. Catholic
  Healthcare W.*, 134 S. Ct. 1938 (2014) .............................................................26, 28

*Klay v. Humana*,
  382 F.3d 1241 (11th Cir.2004) ...............................................................................28

*Levine v. First Am. Title Ins. Co.*,
  682 F. Supp. 2d 442 (E.D. Pa. 2010), Opinion .......................................28, 29, 31

iv

*Levine v. First Am. Title Ins. Co.*,
No. CIV.A 09-842, 2013 WL 4675741 (E.D. Pa. Aug. 30, 2013), Opinion ..........................26

*Mahon v. Chicago Title Ins. Co.*,
296 F.R.D. 63 (D. Conn. 2013)...................................................................................... passim

*Martin v. Ford Motor Co.*,
292 F.R.D. 252 (E.D. Pa. 2013) (Slomsky, J.).................................................................16, 17

*Mitchell-Tracey v. United Gen. Title Ins. Co.*,
237 F.R.D. 551 (D. Md. 2006)........................................................................................33

*Montgomery Cnty., Pa. ex rel. Becker v. MERSCORP, Inc.*,
298 F.R.D. 202 (E.D. Pa. 2014)..............................................................................14, 17, 20

*Randleman v. Fidelity Nat'l Title Ins. Co.*,
646 F.3d 347 (6th Cir. 2011) .........................................................................................34

*Schwartz v. Avis Rent a Car System*,
LLC, No. 11-cv-4052 (JLL), 2014 WL 4272018 (D.N.J. Aug. 28, 2014) .............................32

*Slapikas v. First American Title Ins. Co.*,
298 F.R.D. 285 (W.D. Pa. 2014) .....................................................................................35

*Stanford v. Foamex, L.P.*,
263 F.R.D. 156 (E.D. Pa. 2009).......................................................................................23

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011)............................................................................................24

*Valentino v. Carter-Wallace, Inc.*,
97 F. 3d 1227 (9th Cir. 1996) .........................................................................................26

*Wallace v. Powell*,
2013 WL 2042369 (M.D. Pa. May 14, 2013)......................................................................26

*Walmart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)..................................................................................13, 19, 20, 25

*Wu v. Pearson Educ., Inc.*,
277 F.R.D. 255 (S.D.N.Y. 2011) ......................................................................................32

*Yarger v. ING Bank*,
285 F.R.D 308..........................................................................................................18, 21

*Young v. Nationwide Mutual Ins. Co.*,
    693 F.3d 421 (6th Cir. 2012) ..................................................................15, 28, 32

**STATUTES**

40 P.S. Section 910 (the "Title Insurance Act") ............................................................1

73 Pa. Stat. Ann. § 201-9.2(a)..................................................................................29

Title VII of the Civil Rights Act of 1964....................................................................19

**OTHER AUTHORITIES**

Fed. R. Civ. P. Rule 23 ..................................................................................... passim

Plaintiffs respectfully submit this memorandum of law in support of their Motion for Class Certification. This memorandum of law and the attached Declaration of Shoshana Savett (the "Savett Decl." or the "Savett Declaration"), and exhibits thereto, show that each requirement of Fed. R. Civ. P. 23(a) and (b)(3) is satisfied.

## I.      <u>INTRODUCTION</u>

This action arises out of Defendant First American Title Insurance Company's ("First American" or "Defendant") practice of illegally overcharging Pennsylvania consumers for title insurance. The victims are Pennsylvania homeowners who refinanced their mortgages within two, three or four years (entitling such homeowners to the Refinance Rate, as described below), or who took out mortgages within ten years of the issuance of title insurance on the property (entitling such homeowners to the Reissue Rate, as described below).

Title Insurance rates are regulated by Pennsylvania law, 40 P.S. Section 910 (the "Title Insurance Act"). The Title Insurance Rating Bureau of Pennsylvania (the "Rate Manual") sets forth what First American and other title insurance companies must charge Pennsylvania consumers for lender's title insurance when they finance or refinance their homes. First American's own documents show that First American has cheated many Pennsylvania property owners by charging more than the Rate Manual permits. Plaintiffs have identified more than 40 such overcharges. By these overcharges, First American violated federal and state law.

The members of the Class who paid inflated premiums for lender's title insurance include the following:

•      On August 24, 2005, in a refinance transaction concerning their home in Media, Pennsylvania, Plaintiffs and proposed Class representatives Gary and Carolyn Singer borrowed $240,000. *See* Exhibit 1 to the Savett Declaration, Michael D. Pakter's Expert

Report on Title Insurance Premium Overcharges and Related Matters (the "Pakter Report"), p. 13. First American sold lender's title insurance to the Singers in connection with this transaction. The title insurance should have cost $1,122.30, reflecting the discounted rate to which the Singers were entitled as a result of the refinancing they undertook earlier in 2005. But First American, through its agent, misrepresented that the amount due and owing for title insurance was $1,559. As a result of this misrepresentation, First American misappropriated $436.70 from the Singer Plaintiffs. *Id.*

• In August 2005, Plaintiffs Bruce Levine and Daniel McCorkle borrowed $148,000 to refinance the mortgage on their home in Aldan, Pennsylvania.[1] First American sold a policy of lender's title insurance to Messrs. Levine and McCorkle in connection with the transaction. In light of the fact that Mr. Levine and Mr. McCorkle had refinanced their home only 17 months before, in August 2005, the title insurance should have cost $791.10. But First American misrepresented that the amount due and owing was $1,099. *See* Ex. 1, Pakter Report, p. 13. As a result of this misrepresentation, First American misappropriated $307.90 from Plaintiffs Levine and McCorkle. *Id.*

• ███████████████████ refinanced the mortgage on their home in ████████████████ in May 2008, which was less than three years since they had

---

[1] Plaintiffs Levine and McCorkle moved for voluntary dismissal of their claims on January 8, 2014, upon discovery of the possibility that, in connection with prior litigation, they could be argued to have dismissed any claims against First American. Those Plaintiffs subsequently withdrew their motion for voluntary dismissal. The motion for voluntary dismissal had no impact on the claims of the other Plaintiffs, Gary and Carolyn Singer. Plaintiffs Levine and McCorkle are not moving for class certification, nor are they moving to be appointed class representatives. However, as noted above, they suffered overcharges along with the other members of the Class

refinanced the mortgage on their home in March 2007. They were entitled to a refinance rate of ███, based on the liability or mortgage amount of ███. However, First American charged them ███, which was ███ more than they should have paid. *Id.* at Exhibit B.

- ███████████ purchased lender's title insurance from First American in September 2009, paying a premium of ███ in connection with a refinance of their home mortgage. This premium was ███ more than the lowest applicable rate for this transaction, ███, based on the liability or mortgage amount of ███, and in light of the fact that the ███ had financed the property less than four years previously, in March 2006. *Id.*

A listing of more than 40 Class members that Plaintiffs' expert, Mr. Pakter, has identified to date is set forth in Pakter Report. Mr. Pakter sets forth these overcharges, providing detail, in a database that he has prepared (the "Overcharge Database"). Pakter Report at Ex. B.

In each case above, and in the case of all of the members of the proposed Class, the amount that First American *charged*, the amount that First American *should have charged*, and the amount that First American *overcharged* can be readily ascertained by reference to not more than four sources, each of which may be easily accessed. These four sources are: the *database* of title insurance transactions that First American maintains in the regular course of business; the *HUD-1* Settlement Statement that is completed at closing; and, where necessary, the *title policy* issued or Borrower's Settlement Statement [see e,g, FA-Levine 00573466 and FA-Levine 00573282] and the *public property records and tax information.*

### A. <u>Identification of Class Members</u>

In response to Plaintiffs' discovery requests, Defendant has produced Excel spreadsheets containing certain fields of data from three databases, FAST, WINGS, and STARS. These database exports purportedly contain data on each lender's title insurance policy sold by Defendant during the Class Period.[2] Using the database exports produced to Plaintiffs, together with HUD-1s, title policies issued, and public records, it is possible to determine in an efficient and largely automated fashion those Pennsylvania homeowners that Defendant has overcharged for lender's title insurance policies and by how much.

Following is a brief description of the process by which Plaintiffs and their expert, Mr. Pakter, identify class members.[3] First, the database exports supply a significant amount of the information necessary to calculate the premium that the Rate Manual mandates. In those instances where particular pieces of information necessary to calculate the mandated premium are missing for any particular transaction set forth in the database exports, that information can be efficiently obtained from the HUD-1, the title policy issued, or public records. Ex. 1, pp. 5-9.

For many of the transactions identified in the database exports, the exports provide no information as to the most recent prior financing on the property (which, as described below, is necessary information if one is to determine whether a discount rate applies). In order to supply that missing information, Plaintiffs has used the address of the property as identified on the database export, and, making use of public records, including property and tax records, filled in the missing information. As Plaintiffs' database expert, Michael Pakter, opines in his report, it is possible to access these public records by electronic, automated means. Ex. 1, Pakter Report at 9.

---

[2] An in-depth explanation of Defendant's databases is provided in Section II, D (p. 4) below.
3 Mr. Pakter explains in detail the process of identifying class members. *See* Ex.1 at pp. 5-9.

In particular instances where the database export does not contain the property address for a particular transaction, then Plaintiffs or Mr. Pakter extract the address from either the face of the title insurance policy or the first page of the HUD-1.  As detailed in the Pakter Report, in some cases it is possible to extract the address by automated means; in other cases manual inspection is necessary, but manual inspection is accomplished in a matter of seconds.  Ex. 1, Pakter Report at p.9.

The HUD-1 for each particular transaction is used not only to fill in information missing from the database exports but also to confirm or, where appropriate, to clarify the information set forth on the database exports.  Importantly, the HUD-1 for each transaction confirms what the consumer has been told he or she is paying for the lender's title insurance policy and that the money for the policy has been paid to Defendant and its agent, as it is the HUD-1 that the consumer signs at closing and that sets forth how the loan proceeds are disbursed.  Ex. 1, Pakter Report at p. 9.  *See also* Ex. 2, DiTomo Tr. 45:22-46:6, 94:2-20 (noting the purpose of the HUD-1 is to "zero out" all of the money (i.e., verify that all of the money that comes in is accounted for and equals all of the money that goes out)).  Thus, by reference to the HUD-1, Plaintiffs can confirm that the consumer paid a particular premium amount and that Defendant overcharged. *See Coleman v. Commonwealth Land Title Insurance Co.*, 684 F.Supp.2d 595, 616 (E.D. Pa. 2010) ("Given the requirement under RESPA that a uniform settlement statement be used at settlement, 12 U.S.C. {Sec] 2603, the HUD-1 has the imprimatur that the figures reflected on it are true and correct.")

As Mr. Pakter confirms, a physical analysis of the HUD-1 information for this purpose -- that is, focusing the eye on the relevant portions of the HUD-1 itself, rather than extracting

information from the HUD-1 by electronic means -- takes not much more than one minute. Moreover, in many cases physical inspection is unnecessary because the relevant HUD-1 information may be obtained by electronic means. Pakter Report at p. 9.

The process of uncovering and quantifying overcharges is vastly simplified by applying a mathematical formula or equation to the data for any particular title insurance transaction. By doing so, one may electronically calculate – instantly – the lawful premium for any given transaction. *See Id.*

Applying this mathematical formula, Mr. Pakter has uncovered numerous *specific* instances in which First American charged Class members in excess of the rate prescribed by the Rate Manual. The Overcharge Database sets forth the particulars with respect to each instance in which a Class member was overcharged, listing the amount charged, the amount that should have been charged, and, in most cases, the amount of the overcharge. The Overcharge Database also provides the source of the data (database export, HUD-1, title insurance policy, and public record) supporting Mr. Pakter's findings that Defendant overcharged the particular Class member. *Id.* These results are preliminary; Mr. Pakter states that as discovery continues he intends to continue to examine the databases and other information to uncover additional overcharges.4 Pakter Report at p.9.

_____

4 In determining overcharges, first Plaintiff identifies certain transactions, among others, that appear to be possible overcharges. Plaintiffs do so by supplementing the information appearing on the face of the database as necessary in order to permit calculation of the premium. In particular, the supplementation process involves obtaining information concerning the most recent prior financing on the property by accessing public records through Lexis where the database does not contain such information. The calculation of the premium is accomplished by automatic means, through the use of a computer, by using a formula or algorithm that conforms to the provisions of the Rate Manual, as amended over time. Second, Plaintiffs obtain through the discovery process HUD-1s and title policies with respect to some of these possible

By the foregoing means, and similar means, Plaintiffs will show that, for purposes of class certification, they amply satisfy the numerosity, commonality, typicality, predominance, and other requirements of Rule 23. The proposed Class and the proposed Subclass, which may include a few consumers who were not overcharged along with the vast majority who were, are as follows:

The *Class* consists of all persons who, during the period August 1, 2005 through June 30, 2012 (the "Class Period"), paid premiums for the purchase of lender's title insurance issued by Defendant with respect to homes located in the Commonwealth of Pennsylvania, and for whom Defendant's electronic records or other records, including but not limited to public records, provide information that shows that such homeowners:

> (1) qualified for a Refinance or Reissue Rate discount; and

> (2) did not receive such discount.

The *Subclass* consists of all persons who, during the Class Period, for personal, family or household purposes, paid premiums for the purchase of lender's title insurance issued by Defendant with respect to homes located in the

---

overcharge transactions. Third, Plaintiff's expert uses the HUD-1s and the public records obtained through Lexis to supplement and clarify the information appearing on the database export to confirm that, with respect to specified transactions, overcharges occurred. Plaintiff's expert performs the calculation using a formula or algorithm as described above. For purposes of this calculation, the expert uses the information from the HUD-1, instead of the information from the database, in any instance in which the information from the two sources is not the same. The expert then compares the premium due against the premium paid in order to determine whether an overcharge occurred and, if so, either the overcharge's approximate or minimum amount. Fourth, where necessary or helpful, the expert uses the title policies produced in discovery to obtain or confirm property addresses or other information.

Commonwealth of Pennsylvania that were to be used for personal, family or household purposes, and for whom Defendant's electronic records or other records, including but not limited to public records, provide information that shows that such homeowners:

(1) qualified for a Refinance or Reissue Rate discount; and

(2) did not receive such discount.

With respect to the Class, Plaintiffs advance their RICO claims. With respect to the Subclass, Plaintiffs advance their claims under the UTPCPL.

For purposes of the definitions of the Class and the Subclass, set forth above:

- the **Reissue Rate** means **90%** of the Basic or undiscounted rate. The Reissue Rate applies to a title insurance transaction where the lower Refinance Rate does not apply, and where the real property to be insured is identical to, or a part of, real property insured **ten years** or less before the insured transaction closes.

- The **Refinance Rate**, for the period **August 1, 2005 through March 30, 2007**, is **80%** of the Reissue Rate, and it applies where the real property to be insured is identical to, or a part of, real property insured **three years** or less before the insured transaction closes, and where **the owner of the property is the same as under the earlier mortgage**.

- The **Refinance Rate**, for the period **August 1, 2007 through June 30, 2012**, is **70%** of the Reissue Rate, and it applies where the real property to be insured is identical to, or a part of, real property insured **two years** or less before the insured transaction closes, and where **the owner of the property is the same as under the**

*earlier mortgage*. The Refinance Rate, for the period
*August 1, 2007 through June 30, 2012*, is *80%* of the
Reissue Rate, and it applies where the real property to
be insured is identical to, or a part of, real property
insured between *two and four years* before the insured
transaction closes, and where *the owner of the property
is the same as under the earlier mortgage*.

## II.    STATEMENT OF FACTS

### A.    The Nature of Title Insurance

A title insurance policy guarantees that a parcel of real property is free and clear of all

liens and encumbrances except as disclosed in the title policy.  There are two types of title

insurance policies: owner's policies and lender's or loan policies.  This litigation pertains only to

lender's or loan policies issued in connection with financing or refinancing transactions.  A

lender's policy protects the interest of the mortgage lender, though, typically, the homeowner

pays the premium.

### B.    How First American Sells Title Insurance in Pennsylvania

First American, a national title insurance underwriter, issues title insurance policies

throughout Pennsylvania.  First American sells some of these policies in Pennsylvania directly

from its own offices.  Sales of policies by Defendant's direct operations are recorded in the

FAST database.  *See* Ex. 3, Defendant First American Title Insurance Company's Objections

And Answers To Plaintiffs' Second Set of Interrogatories Directed To Defendant at pg. 6.

First American also sells policies in Pennsylvania through a network of non-employee,

purportedly independent title agents.  The First American lender's policies sold in Pennsylvania

by non-employee title agents are recorded in the WINGS and STARS databases.

First American enters into written agency agreements with its non-employee agents, which provide that the title agents are permitted to sell First American title policies, and further provide how much First American is to be paid for each policy sold. *See*, for example, agency agreements, Exs. 4 and 5. The agency agreements require, *inter alia*, that the title agents maintain all records and documents from their title transactions, as required by Pennsylvania law. The agreements require the title agents to turn over any transaction documents to First American at First American's request, to provide First American access to the agents' records, and to audit the agents' files. *See* Ex. 4 ¶¶ 2(B), 4(A), and 5 and Ex. 5 ¶¶ 2(B), 4(A) and 5. The agreements also require that the agents send monthly remittances to First American for policies sold during the month. *Id*. at ¶ 2(C).

The refinancing transactions are standardized. Agents receive orders for title insurance from customers, search the chain of title for prior deeds and mortgages, prepare title insurance commitments that identify and except prior mortgages unless satisfied, prepare HUD-1 Settlement Statements, attend closings in which they execute (along with the consumer) the HUD-1, which includes the amount of the title insurance premium charged, disburse the loan proceeds, including paying off prior mortgages, as stated on the Hud-1 and send "remittance reports" and other information to Defendants. See Ex. 2 DiTomo Tr. 22:14-23:2, 25:13-22, 27:14-28:14, 45:22-46:19, 59:14-17, 61:24-62:23)

### C.      The Statutory Regulation of Title Insurance Premiums

First American is obliged to abide by the Rate Manual in issuing title insurance policies. *See* Defendant First American Title Insurance Company's Answer and Affirmative Defenses to Amended Complaint and Demand for Jury Trial ("Answer"), (Dkt. 71, ¶ 26).

The Rate Manual provides for a discount in various situations. The Reissue Rate, which is 90% of the undiscounted or Basic Rate, applies where the real property to be insured is identical to, or a part of, real property insured within the last ten years, regardless of who was the owner of the property at the time the prior insurance was purchased. The Refinance Rate, depending on the date of the closing of the transaction, and also depending upon when the prior insurance was purchased, provides for a discount of either 70% or 80% of the Reissue Rate. The Refinance Rate requires that the current property owner was the owner of the property at the time the prior insurance was purchased. Importantly, the Rate Manual was clarified in 2005 to provide that, where the prior financing involved an institutional lender – that is, where there was "the . . . recording of a deed or an unsatisfied mortgage to an institutional lender" – this constitutes sufficient evidence of the purchase of title insurance on the occasion of the prior financing. *See* Ex. 6, Manual of Title Insurance Rating Bureau of Pennsylvania, as Amended Through August 1, 2005 at ¶¶ 5.3, 5.50 and Ex. 7, Manual of Title Insurance Rating Bureau of Pennsylvania, as Amended Through October 1, 2008 ¶¶ 5.3, 5.6, 5.50.

### D.    Defendant's Databases

[REDACTED]

### E.    First American Overcharged Plaintiffs and the Members of the Class

Although required to charge the rates set forth in the Rate Manual, First American, acting by and through its own employees and its non-employee title agents, repeatedly overstates the amount of money due and owing for title insurance in refinance transactions and uses those misrepresentations to inflate closing costs and misappropriate money from the homeowners' loan proceeds.  All of the misappropriations occur in the same way, as illustrated by the transactions of Plaintiffs and others, as described above.  First American overcharges other Class members in the same way as it did these persons.  Although it has faced numerous class actions around the United States, spanning a number of years, First American has failed to take even the most minimal corrective actions that could have prevented these overcharges.

12

The Overcharge Database, which is attached to the Pakter Report, sets forth overcharges that, at this stage of the discovery process, Plaintiffs have been able to confirm. Ex. B to the Pakter Report.

### III.  ARGUMENT

#### A.  The Standards Governing Class Certification Under Fed. R. Civ. P. 23

Under Rule 23, a member of a class may sue in a representative capacity for all class members if certain elements are satisfied.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (U.S. 2013) ("*Amgen*").  For a class action to be certified, Plaintiffs must meet the four requirements of Rule 23(a), along with one of the subparts of Rule 23(b).  To certify a class, the court must find, by a preponderance of the evidence, that the proposed class action satisfies the requirements of Rule 23.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).  The court should consider merits inquiries only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen,* 133 S. Ct. at 1194.  *See also Walmart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-2 (2011) (Although class certification is by no means a "mere pleading standard," it is the elements of Rule 23 (and not the merits) that the party seeking class certification must prove under a "rigorous analysis" standard.)  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194-1195.

Similarly, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 (U.S. 2013) (citing 2 W. Rubenstein, Newberg on Class Actions § 4:54, p. 205 (5th ed. 2012) (ordinarily, "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)")).  "The amount of damages is invariably an individual question and does

not defeat class action treatment." *Id.* "Indeed, a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings." 2 W. Rubenstein, supra, § 4:54, pp. 207-208. *See also Montgomery Cnty., Pa. ex rel. Becker v. MERSCORP, Inc.*, 298 F.R.D. 202, 218 (E.D. Pa. 2014) ("the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.").

## B. The Class Is Readily Ascertainable, And The Requirements Of Rule 23(A) Are Readily Met

As an initial prerequisite to class certification, "plaintiff must show . . . that the class is ascertainable." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) To satisfy the requirement of ascertainability, "the class must be defined with reference to objective criteria," and "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Alexander v. Coast Prof'l Inc.*, No. CIV.A. 12-1461, 2014 WL 4413598, at *3-4 (E.D. Pa. Sept. 5, 2014), *appeal dismissed* (Dec. 17, 2014). Here, Plaintiffs have satisfied both criteria. First, the Class includes the following objective criteria:  1) persons who owned homes in Pennsylvania; 2) who, during the Class Period, financed or refinanced those homes; 3) where, with respect to all or some of the property, either the homeowners financed or refinanced with an institutional lender within the last two, three, or four years *or* a prior owner financed or refinanced with an institutional lender within the last ten years; and 4) who bought title insurance from First American.  In addition, the Subclass involves the further objective criterion that the persons bought the title insurance from First American for personal, family or household purposes, which is self evident in residential transactions.

Second, as set forth above and in the Pakter Report, each member of the Class and the Subclass may be ascertained by means of "a reliable and administratively feasible manner", using Defendant's electronic records and other records, such as HUD-1s and public records. In many instances information can be obtained by automated or electronic means without the need to check or review information on a file by file basis. *See* Ex. 1, Pakter Report at pp. 7-9 (with respect to sales by Defendant's employees, as opposed to independent agents, HUD-1 information can be electronically searched and added to the Overcharge Database through an automated process). *See Young v. Nationwide Mutual Ins. Co.*, 693 F.3d 421 (6th Cir. 2012) (finding ascertainability using defendants' electronic records and available geocoding software, though the process would likely require substantial additional review of files).

Indeed, to the extent that ascertaining liability and damages may involve extremely limited file-by-file review for some Class members, this would not impose undue burden or expense or raise issues of manageability. *Id.* (describing the negligible amount of time required to check a single section of the HUD-1 to confirm or clarify the premium amount set forth on the database export produced by Defendant). *See also Mahon v. Chicago Title Ins. Co.,* 296 F.R.D. 63, 76 (D. Conn. 2013) (if file by file review involved in determining who was overcharged, the trial will not be file by file; class of overcharged title insurance purchasers certified).

## C.  Plaintiffs Meet All Of The Requirements Of  Rule 23(a)

Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so *numerous* that joinder of all members is impracticable, (2) there are questions of law or fact *common* to the class, (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class, and (4) the representative parties will *fairly and adequately protect the interests of the class*."

(Emphasis added.)  *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148

F.3d 283, 308 (3d Cir. 1998).  Each of the requirements of Rule 23(a) is met.

### 1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No minimum number of plaintiffs is

required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that

the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."

*Alexander*, 2014 WL 4413598, at *4 (quoting *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d

Cir.2001)).  *Accord Martin v. Ford Motor Co.,* 292 F.R.D. 252 , 267  (E.D. Pa. 2013) (Slomsky,

J.) (generally, if the potential number of plaintiffs exceeds 40, the numerosity requirement is

satisfied).  Plaintiffs need not provide evidence of "exact number and identities of the class

members."  *Id.*

Here, Plaintiff's expert, Mr. Pakter, has determined that the Class consists of over 40

members.  *See* Ex. 1, at Ex. B.  Plaintiffs thus satisfy the numerosity requirement.

### 2.    There Are Questions Of Law And Fact Common To The Class

Rule 23(a)(2) requires "that there are questions of law or fact common to the class."  "It

is the law in the Third Circuit that a putative class satisfies the commonality requirement if 'the

named plaintiffs share at least one question of fact or law with the grievances of the prospective

class.'" *Montgomery Cnty., Pa. ex rel. Becker*, 298 F.R.D. at 210 (citing *Rodriguez v. National

City Bank*, 726 F.3d 372, 382 (3d Cir.2013))

Commonality requires that the plaintiff demonstrate that the class members' claims

"'depend on a common contention [that is] of such a nature that it is capable of classwide

resolution – [and] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *See Alexander*, 2014 WL 4413598, at *4 (citation omitted) (alteration in original).  Importantly, even a single common question may be sufficient to satisfy commonality.  *See Martin,* 292 F.R.D. at 267 (in case alleging defective axle on a class basis, common factual proof of defect will help resolve a central issue).  Factual differences among the putative class members' claims do not defeat class certification.  *Montgomery Cnty., Pa. ex rel. Becker*, 298 F.R.D. at 210.

Shared questions of law *and* fact between Plaintiffs and Class members include:

(1)     whether  Defendant and its agents repeatedly collected in the same fashion premiums from Class members in amounts exceeding those permitted under the Rate Manual;

(2)     whether Defendant violated Pennsylvania law by charging and collecting premiums in excess of the amounts permitted by  the  Rate Manual in connection with  home mortgage refinancing transactions in Pennsylvania;

(3)     whether Defendant adequately instructed title agents regarding the calculation of premiums under the Rate Manual;

(4)     whether Defendant's audits of its agents were sufficient to determine if the Rate Manual was followed;

(5)     whether Defendant willfully blinded itself to the overcharging by not adequately checking  the premiums charged and issuing refunds in the event of overcharges;

(6)     whether Defendant determined if refunds should be made to overcharged refinancing homeowners;

(7)     whether the formula created by Plaintiffs' expert, Mr. Pakter, accurately calculates the premium due in accordance with the Rate Manual;

(8)     whether Defendant's databases are accurate and admissible; and

(9)     whether  Defendant is liable for excessive premium charges;

Moreover, the factual basis of the claim is common to all class members. In each case, Defendant undertook the same conduct towards the Plaintiffs and the putative class members: the Defendant, through its agent, provided a Hud-1 and charged an amount which varied from the amount provided in the Rate Manual. *See Alexander*, 2014 WL 4413598, at *4 (commonality satisfied where defendant's conduct was the same against each class member). In *Yarger v. ING Bank,* 285 F.R.D.308, the court certified a consumer fraud class of all individuals who purchased or retained a loan from the bank. Plaintiffs alleged that the defendant breached a promise to renew a loan at a specific price by charging a higher price. The court found that commonality was satisfied where the claims "depend[ed] on the contention that [the defendant] promised [a loan] at specific prices and then broke this promise by charging higher fees than advertised," as proof of such contention "would help resolve the claims of all class members." *Id.*

Similarly, here, questions as to whether Defendant violated the Rate Manual by charging and collecting premiums in excess of amounts permitted by the Rate Manual, or whether Defendant willfully blinded itself to overcharges by not adequately checking premiums and auditing agents, will help resolve the claims of all Class members.5 *See Mahon v. Chicago Title*

---

[5] First American's supervision of its independent agents in Pennsylvania and elsewhere to insure that the agents charged the lowest applicable rate for lender's title insurance was not robust. Karen Bouffard, a former auditor for First American from 2000 until 2010 testified that the purpose of agency auditing was to identify theft and fraud and to protect First American Ex. 14, Bouffard Tr. 20. Although every agent was supposed to be audited every year, auditors were told to concentrate their efforts on reviewing the escrow accounts of the agents; the underwriting review, which included rate testing, was limited. Id. at 13. The auditors selected 5 to 25 files for an underwriting review during each audit depending on the size of the agency. Id. at 14. In the files selected for an underwriting review the audits also checked to make sure that funds were disbursed in accordance with the HUD- 1. Id. at 41. Thus, given the volume of lender's policies sold by First American in Pennsylvania during the class period very few were examined to determine whether the lowest applicable rate was charged.

*Ins. Co.*, 296 F.R.D. at 70 (in title insurance overcharge case, common issues include whether the class was entitled to a discount rate and failed to receive it).

Plaintiffs anticipate that First American will argue that the Supreme Court decision in *Walmart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), renders the claims in this case unsuited for class certification because they fail the commonality prong of Rule 23. In fact, *Wal-Mart* has no impact on commonality in this case.

*Wal-Mart* involved a claim for company-wide discrimination under Title VII of the Civil Rights Act of 1964. In finding that the class failed the commonality prong of Rule 23(a), the Court emphasized the unique nature of the Title VII claim:

> In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a *pattern or practice* of discrimination. This is so because, **in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'**
>
> Here respondents wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, **it will be impossible to say that examination of all the class members' claims for relief will produce a common answer** to the crucial question *why was I disfavored*.

*Wal-Mart Stores, Inc.*, 131 S. Ct. at 2552 (bold emphasis added).

The claims in the present case are starkly different. Evidence of all of the overcharges is reflected, in whole or in part, on Defendants' databases. All transactions of the independent agent are reviewed by Defendant when they are recorded on the various databases and are subject to audit by Defendant. This is not a case, as in *Dukes*, where alleged wrongdoing – in

.

19

that case, allegedly improper employment actions regarding female employees – resulted from decision making at the local or district level without overall direction or control by central management. Here, by contrast, the illegal activity at issue – overcharging for insurance premiums – was reported to Defendant, and Defendant entered relevant information in its databases. Indeed, First American actually computed the premium on a transaction by transaction basis, which provided First American the opportunity not only to uncover but also to correct the premium overcharge. Further, Plaintiffs here are not suing about "millions" of individual employment decisions, but rather a manageable number of transactions in which homeowners were overcharged in violation of the Rate Manual, when the correct amount of the premium is a mathematical calculation, not a matter of opinion or judgment.

Moreover, *Dukes* does not require that plaintiff demonstrate the "existence of common answers at the time of class certification" – only common contentions. *Mahon v. Chicago Title Ins. Co.,* 296 F.R.D. at 73. Commonality is not defeated if the extent of damage and the amount of loss varies from one class member to the next. *Montgomery Cnty., Pa. ex rel. Becker,* 298 F.R.D. at 211, n.4. .

### 3. Plaintiffs' Claims Are Typical Of The Claims Of The Class

Rule 23(a)(3) requires that the representative Plaintiffs' claims be typical of the class. "Typicality and commonality are closely related and often merge. Typicality, however, derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class." *Alexander*, 2014 WL 4413598, at *5.

The typicality requirement is satisfied here. Like others, the Singers refinanced their home and were overcharged for lender's title insurance, in the same fashion. Defendant

misrepresented the amount due and owing for title insurance and collected the overcharges at the closings of Plaintiffs' refinance transactions. Defendant did not disclose that the Rate Manual mandated a lower charge. Because of Defendant's conduct, Plaintiffs, like other Class members, were charged more than the rate required by the Rate Manual.

Moreover, because Defendant cheated Plaintiffs and other Class members in the same way, Plaintiffs' claims are aligned with those of all other Class members whom First American overcharged, such that prosecution of this case would advance the interests of the absent Class members. Thus, since Plaintiffs' claims arise out of the same course of conduct by Defendant, Plaintiffs assert the same legal theories against Defendant as all other overcharged Class members, and Plaintiffs seek the same type of economic damages, there are no conflicts whatsoever between Plaintiffs and the Class. *See Alexander,* 2014 WL 4413598, at *5 (complete factual similarity is not required; some factual disparities do not rise to the level of a conflict); *Yarger v. ING Bank*, 285 F.R.D. at 295 (typicality satisfied where plaintiffs' legal claims were identical to those of the proposed class and the basic factual circumstances supporting plaintiffs' claims were shared by the rest of the Proposed Class).

### 4. Plaintiff Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires that plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Rule 23(a)(4) "encompasses two distinct inquiries designed to protect the interests of absentee class members. First, the adequacy of representation inquiry tests the qualifications of the counsel to represent the class. Second, it serves to uncover conflicts of interest between named parties and the class they seek to represent." *Prudential*, 148 F.3d at 312 (citations and quotation marks omitted). Plaintiffs have retained the law firms of

Berger & Montague, P.C. and Ann Miller, LLC to represent them and the Class. These law firms have extensive experience prosecuting complex litigation in federal courts and class action cases of this type. Counsel respectfully suggests that a review of the firm resumes demonstrates that Class counsel can and will competently and vigorously protect the rights of the Class members.[6] Indeed, the hard-fought nature of this case to date, including successive motions, demonstrates Class counsel's tenacity.

As to the adequacy of the Plaintiffs, each of them understands that she or he represents a Class that includes persons who were overcharged by Defendant, and that Defendant or its representative misrepresented what was due and owing for title insurance in connection with her, his or their refinance transaction. For instance, Mr. Singer testified that he was representing "[e]verybody that was done wrong." When asked to specify the wrongdoing alleged, Mr. Singer responded that he represented "[a]nybody that was overcharged for insurance." Mr. Singer also testified that he believed First American overcharged him for title insurance. Ex. 10, Gary H. Singer Tr. 27:24-28:3.

Accordingly, the Class Plaintiffs are committed to helping the other people who were overcharged by First American in Pennsylvania just as they were.

Courts have found the adequacy requirement to be met where "the named plaintiffs and the absent class members have claims that arise from the same course of conduct by the defendants and they seek the same remedies." *In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 235 (E.D. Pa. 2009). Differences across class members' claims are not enough to defeat class certification under Rule 23(a)(4) unless such

---

[6] The resumes of these two law firms are attached as Exhibits 11-12, respectively.

differences give rise to the level of an actual conflict of interest within the class. *See In re Pet Food Prods. Liability Litig.*, 629 F.3d 333, 348 (3d Cir. 2010); *Stanford v. Foamex, L.P.*, 263 F.R.D. 156, 171 (E.D. Pa. 2009). Here, there is no conflict, as all Plaintiffs and overcharged Class members were subjected to the same practice by Defendant of misapplying the Rate Manual and misappropriating the overcharged amounts.

## D. All of the Requirements of Rule 23(b)(3) are met.

In addition to satisfying the requirements under Rule 23(a), Plaintiffs satisfy Rule 23(b)(3), which provides that certification is appropriate where the court finds that "questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### 1. Common issues predominate

Rule 23(b)(3)'s predominance inquiry asks whether the proposed class is "sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.'" *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'element of her claim is susceptible to classwide proof,' but rather, the rule requires "that common questions '*predominate* over any questions affecting only individual class members.'" *Amgen*, 133 S. Ct. at 1196. (emphasis in original). Moreover, common issues predominate even if not every member of the putative class is entitled to relief. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (U.S. 2014) (individual questions do not predominate simply

because "the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal.")

With respect to whether class-wide claims predominate in the context of allegations of title insurance overcharges, the court in *Mahon v. Chicago Title Ins. Co.* focused on the standardized nature of the transactions at issue and the claims asserted: 1) the class members paid premiums; 2) defendant insurer was required by law to charge in accord with the filed rate; 3) the class members paid the rates charged, which were in fact overcharges; and 4) the class members suffered damage from the overcharges. 296 F.R.D. at 77.

Here, as in *Mahon,* class certification is appropriate under Rule 23 (b)(3) because the most important issues, both factually and legally, are common to the Class and predominate over individual issues. Every Class member who was overcharged was harmed in the same way by First American's employees or agents. Every such Class member was misled by an inflated number on the HUD-1 that included an illegally high premium. Every such Class member suffered loss when, *inter alia*, an excess, unlawful amount for title insurance was paid out of her or his loan proceeds.

This case focuses on Defendant's protocols and willful blindness that robbed Class members of the full reissue and refinance discounts to which they were entitled. These practices give rise to common issues of law and fact that predominate over any possible individual issues in this case. "[P]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws ...." *See Prudential*, 148 F.3d at 314 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Common proof at trial would include standard form HUD-1s, the Rate Manuals, First American 30(b)(6) testimony, including

testimony concerning the audit process (or lack thereof), and testimony regarding standard disbursement procedures.

Indeed, the only individual issues in this case are those of damages – the determination of how much individual Class members were overcharged. The presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3). See *Wal-Mart v. Dukes*, 131 S. Ct. at 2558 (deeming it "clear that individualized monetary claims belong in Rule 23(b)(3)"). *See also Mahon v. Chicago Title Ins. Co.*, 296 F.R.D. at 79 (D. Conn. 2013) (damages calculation do not pose an obstacle to class certification where such calculations are "a straightforward mathematical calculation based on the difference between the rate potential class members received and the filed reissue rate, the rate that the class members allegedly should have received, all of which is based on the same uniform application of the filed rates.")[7]

### a.        Common Issues Predominate under RICO

Class action treatment is commonly accorded to claims brought under RICO. *See e.g., CGC Holding Co., LLC v. Broad and Cassel,* No. 13-1255, 2014 WL 6872148 (10th Cir. Dec. 8, 2014); *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) *cert. denied sub nom. US Foods, Inc. v. Catholic Healthcare W.*, 134 S. Ct. 1938 (2014).

---

[7] Alternatively, Plaintiffs request the Court certify a liability-only class. Under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "[I]f common questions do not predominate over the individual questions so that class certification of the entire action is warranted," a court may use Rule 23(c)(4) to "isolate the common issues and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227, 1234 (9th Cir. 1996); see also *Wallace v. Powell*, 2013 WL 2042369, at *10 (M.D. Pa. May 14, 2013) ("[c]ourts frequently use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication.") (Citations and internal quotations omitted).

As this Court states:  To state a claim under § 1962(c), Plaintiffs must allege that a "person" employed by or associated with an "enterprise" engaged in the following activity: '(1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity.'"  *Levine v. First Am. Title Ins. Co.*, No. CIV.A 09-842, 2013 WL 4675741, at *4 (E.D. Pa. Aug. 30, 2013), Opinion of August 30, 2013, at 6 (Dkt. 98).  Racketeering activity includes mail and wire fraud under 18 U.S. §§ 1341 and 1343.

Here, First American violated the law by charging and receiving an amount of money in excess of the amount that the Rate Manual mandates.  Defendant also engaged in an unconscionable commercial practice violative of RICO by willfully blinding itself to the fraud being perpetrated on Pennsylvania homeowners by First American's agents.  Plaintiffs and other members of the proposed Class suffered ascertainable losses, i.e., the amount of the overcharge, as a proximate result.

First American bears responsibility for the calculation of the title insurance premium charged for every sale of lender's title insurance transaction, and First American is aware of, or willfully blinds itself to, the fact that its own employees and agents have been overcharging many Pennsylvania homeowners who purchase these policies.  If First American had exercised its rights to control and direct its employees and agents, it would have ascertained the correct prior liability amount, verified the title insurance premium calculation, and then proceeded, where necessary, to correct overcharges and effect refunds to the refinancing homeowners.  It has not done so.

With respect to reliance and whether common issues predominate, in *CGC Holding Co., LLC,* 2014 WL, real estate borrowers brought suit under RICO against a group of lenders.  The

26

borrowers alleged that, had they known the truth about the lenders' financial history and lack of ability or intent to fund a loan, they would not have paid the up-front, non-refundable fees. According to the court, each class member's payment of such fees in exchange for a loan commitment is circumstantial proof of reliance on the lenders' misrepresentations and omissions. 2014 WL 6872148 at *11. *See also Mahon,*, 296 F.R.D. at 76-77 (not plausible that, had a title insurance consumer been aware of the chance to save money by paying the lower rate prescribed by state law, he would have chosen to pay a higher rate); *In re Coordinated Title Ins. Cases*, No. 010764/2002, 2 Misc.3d 1007(A), 2004 WL 690380, at *9 (N.Y.Sup.Ct. Jan. 8, 2004). (same). As this Court explained: "A purchaser of title insurance . . . would reasonably assume that the charged listed on the HUD-1 were the charges legally due and owing and not an inflated amount." *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 463-64 (E.D. Pa. 2010), Opinion of January 14, 2010 at 28 , (Dkt. 37).

Indeed, as *CGC Holding* points out, reliance is not required under RICO, even if proof of reliance can often serve as a useful stand-in for causation. *CGC Holding Co., LLC*, 2014 WL 6872148, at *9 (cases involving financial transactions "are the paradigmatic examples of how the inference operates as an evidentiary matter."); *See In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d at 120 (payment may present circumstantial proof of reliance where fraudulent overbilling alleged; *Klay v. Humana*, 382 F.3d 1241, 1258 (11th Cir.2004), abrogated on other grounds by *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131 (2008) (circumstantial evidence can show that reliance is common to the whole class, where plaintiff

alleges that HMOs entered into a conspiracy to systematically underpay physicians with respect to reimbursements).[8]

The fact that Plaintiffs may have to review individual information to determine who suffered from misrepresentation and overcharge does not defeat predominance. *See Young*, 693 F.3d 532, 544-45 (rejecting defendants' argument that predominance was not satisfied where plaintiffs insured alleged they were assessed incorrect charges for local government premium taxes as a result of the companies' failure to correctly identify the taxing jurisdiction in which the insured risks of each policyholder was classified, and individual review would be required to determine liability.)

**b.** <u>**Common issues predominate under the UTPCPL**</u>

To prevail on their UTPCPL claim, Plaintiffs must establish three elements: (1) Plaintiffs purchased "goods or services primarily for personal, family or household purposes," 73 Pa. Stat. Ann. § 201-9.2(a); (2) Defendant engaged in "fraudulent or deceptive conduct which creat[ed] a likelihood of confusion or of misunderstanding," id. § 201-2(4)(xxi)14; and (3) Plaintiffs suffered an ascertainable loss of money as a result of Defendant's fraudulent or deceptive conduct, id. § 201-9.2(a).

Fraudulent or deceptive conduct can be proven based on common proof.[9] Plaintiffs are alleging the same deceptive conduct with regard to every single transaction. Each Class member

---

[8] As the *CGC Holding* court noted, the effect on the litigation of this inference may be limited. At trial, plaintiff must still prove RICO causation by a preponderance of the evidence. In any event, the significance of the causation element at trial, combined with common misrepresentations and omissions, means that class claims will prevail or fail in unison. 2014 WL 6872148, at *13 (citing *Amgen*, 133 S. Ct. at 191)

[9] With respect to the first element, the Subclass, by definition, is limited to purchasers of residential title insurance, and the purchase of title insurance in connection with the purchase of a residence qualifies as the purchase of a service "primarily for personal, family or household

28

will rely on common evidence -- including the Rate Manual, the standard form HUD-1, the standard method of filling out Hud-1s, and Defendant's failure to take steps to correct the overcharging problem -- to prove this element. Plaintiffs will also prove intent through evidence common to the Class, including First American's almost certain knowledge that the failure to give proper discounts is a widespread and common problem in the industry.

The third element, ascertainable loss, is also amenable to class treatment, because the nature and content of the loss suffered by Plaintiffs and each Class member is the same in every transaction -- the amount of the overcharge. While the exact dollar amount will differ for each Class member, it can be objectively ascertained by reference to the Rate Manual, as shown in the Pakter report. *See Allen v. Holiday Universal*, 249 F.R.D. 166, 192 (E.D. Pa. 2008) (certifying UTPCPL claim notwithstanding defendants' contention that class treatment was inappropriate because the UTPCPL's "ascertainable loss" requirement demanded individualized inquiry; by definition, proposed class excluded persons who did not pay an allegedly excessive initiation fee and thus did not suffer an ascertainable loss).

Plaintiffs anticipate that Defendant will argue that the requirement of reliance prevents class certification under the UTPCPL. However, the Superior Court recently re-emphasized that reliance is not required for deceptive conduct under the catchall provision of the UTPCPL. *See* Ex.13, *Baum v. Keystone Mercy Health Plan*, No. 2677 EDA 2013 (Pa. Super. Dec. 9, 2014). In *Baum*, the Superior Court vacated the trial court's refusal to grant class certification on the basis that reliance was required under the UTPCPL. Citing *Grimes v. Enterprise Leasing Co. of*

---

purposes." *Himmelreich v. Adams Abstract Assoc.*, 59 Pa. D & C 4th 382, 401 (Com. Pl. Ct. 2002). *See also Levine*, 682 F. Supp. 2d at 463-64, Opinion of January 14, 2010 at 33 (Dkt. 37) ("a mortgage for a home is inherently for a household purpose.")

*Phila., LLC*, 66 A.3d 330, 337 n.4 (Pa. Super. 2013), *reversed on other grounds*, *Grimes v. Enter. Leasing Co. of Philadelphia*, LLC, No. 4 MAP 2014, 2014 WL 7088933 (Pa. Dec. 15, 2014), and *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 152 n.5, 154-155 (Pa. Super. 2012), the Court noted that it had recently held that a plaintiff need not show justifiable reliance for deceptive conduct under the catchall provision.

Even if this Court were to find that justifiable reliance is required, each Class member's payment of such fees in exchange for a loan commitment is circumstantial proof of reliance on the lenders' misrepresentations and omissions. As discussed above, this Court explained: "A purchaser of title insurance . . . would reasonably assume that the charged listed on the HUD-1 were the charges legally due and owing and not an inflated amount." *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 463-64 (E.D. Pa. 2010). (Dkt. 37). *See also Cave v. Saxon Mortgage Servs., Inc.*, No. CIV.A. 11-4586, 2013 WL 460082, at *1 (E.D. Pa. Feb. 6, 2013) (noting that a presumption or reasonable inference of reliance was appropriate where defendant had omitted material information).

### 2.    The Class Action Device Is The Superior Method To Adjudicate This Controversy

The superiority inquiry "requires the Court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods of adjudication." *Alexander*, at *8 (citation omitted). In making a determination concerning superiority, Rule 23(b)(3) requires a court to consider four factors in determining that a class action is superior to individual adjudications: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

All of these factors support the superiority of a class action in this case. Plaintiffs' and Class members' individual damages are relatively small. For example, the Singer Plaintiffs lost 436.70. A class action will allow Class members to pool their claims and seek redress, when it otherwise would be too expensive to litigate on an individual basis.

Plaintiffs are also not aware of any specific individual suits brought against First American in Pennsylvania in connection with the premium practices at issue here. Other class action litigation in Pennsylvania against First American concerned an earlier period, prior to the 2005 amendments to the Rate Manual.

This Court is an appropriate forum to adjudicate this case. No other forum is more suitable. Plaintiffs live in this District and their transactions, and the transactions of other Class members, took place here. Defendant does business in this District. All of the facts giving rise to this action occurred to Plaintiffs in this District. Moreover, many of the witnesses reside and work in this District.

Finally, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.". *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 271 (S.D.N.Y. 2011). *See also Schwartz v. Avis Rent a Car System, LLC*, No. 11-cv-4052 (JLL), 2014 WL 4272018, at *14 (D.N.J. Aug. 28, 2014) ("Since challenges to the manageability prong of the superiority requirement often arise when a case involves many individual issues, 'the manageability concern often simply echoes the predominance analysis[;][t]herefore, courts generally hold that if the predominance requirement

is met, then the manageability requirement is met as well.'") (quoting Newberg on Class Actions § 4:72).

There are no choice of law questions. Courts have also certified classes far larger than this Class. The Class can be identified based primarily on information contained on Defendant's FAST, STARS, and WINGS databases, augmented as appropriate by easily accessible HUD-1s, title policies and public records. Indeed, manageability is not compromised even where an individualized review is required to establish liability. *See e.g.*, *Young*, 693 F.3d at 545 (rejecting defendant's manageability arguments based on the argument that individual inquiries into defendant's files are required to establish liability).

Finally, whatever claims administration issues may later arise, they are not only surmountable but trivial in comparison between to the efficiency and fairness benefits of class certification.

### A.      This Case is Similar to Other Title Insurance Overcharge Cases that Have Been Certified

Courts have certified title insurance cases similar to the case at hand. *See Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006); *Dubin v. Sec. Union Title Ins. Co.*, 832 N.E.2d 815 (Ohio Ct. App. 2005); *In re Coordinated Title Ins. Cases*, 784 N.Y. Sup. 2004).

Recently, in *Mahon*, the court certified such a class under Connecticut law, which, similar to Pennsylvania law, prescribed a discounted rate for title insurance where particular conditions were satisfied. In *Mahon,* as in the present case, plaintiff enumerated particular instances in the defendant insurer overcharged homeowners. 296 F.R.D. at 70. The court concluded, *inter alia*, that the class could be identified by objective criteria set forth in the

proposed class definition (*id.* at 72); that circumstances under which the defendant insurer should provide discounted title insurance rates will not vary from one class member to the next (*id.* at 72); and that class members assert the same legal arguments against, and bear the same relationship with, the defendant insurer.  *Id.* at 74.

        **B.**      <u>**This Case is Distinguishable from Title Insurance Cases in in Which Certification Has Been Denied**</u>

Although there are title premium overcharge cases where courts have denied class certification, these cases are inapposite.  In several cases, state law required plaintiffs to show that they had purchased a title insurance policy in connection with a prior loan on their property. *See e.g. Corwin v. Lawyers Title Ins. Co.*, 276 F.R.D. 484 (E.D. Mich. 2011); *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011).  In the present case, by contrast, the Manual does not require proof of an earlier title policy. Indeed, the Manual was changed in 2005 specifically for the purpose of clarifying that in Pennsylvania no such requirement exists. *See* Ex. 6 and 7.

Also distinguishable is *Boucher v. First American Title Insurance Co.*, 2012 WL 3023316 (W.D. Wash. May 2, 2011), where the court found  that "proving each class member's claims would require a time-consuming individualized process," and "the [plaintiffs] have offered no means to do so manageably." *Id*. at *24.  Here, in contrast, proof of the claims of Plaintiffs and Class members can be established by using automated or electronic means to search and compile information from electronic records, including First American's databases, First American's HUD-1s, and public records.  Pakter Report at pp. 9-13.  To the extent that any manual file by file analysis is employed, it is a matter of examining specific portions of discrete

documents, with each analysis of HUD-1 information, for example, requiring a matter of not much more than one minute. Pakter Report at p. 9.

In *Haskins v. First American Title Ins. Co.,* No. CIV. 10-5044 RMB/JS, 2014 WL 294654, at *1 (D.N.J. Jan. 27, 2014), the court denied certification on grounds that do not apply to the present case. According to the *Haskins* court, plaintiff could not rely on the reliability and the accuracy of First American's electronic databases. 2014 WL 294654, at *13. That consideration does not apply in the present case where, as noted, the transactions as set forth on the databases are compared against the HUD-1s for those same transactions. The court also found that it was not possible to calculate premiums on the basis of the information contained on the databases. *Id.* ████████████████████████

████████████████████████████████████████████

████████████ Here, unlike *Haskins*, Plaintiffs fill in any information missing from the databases by accessing HUD-1s, title policies and public records. *See* Pakter Report at pp. 8-9.

Finally, recent decisions under Pennsylvania law have denied certification, but for reasons that do not apply to the present case. In *Alberton v. Commonwealth Land Title Ins. Co.,* 299 F.R.D. 109, (E.D. Pa. 2014), the court's decision was based *wholly* on a requirement in the Manual – requiring proof of a prior title insurance policy – that was eliminated from the Rate Manual applicable to the Class Period alleged in this case. 299 F.R.D. at 115-118. In *Slapikas v. First American Title Ins. Co.,* 298 F.R.D. 285, (W.D. Pa. 2014), the Court decertified a previously-certified class primarily because of the purported need under the UTPCPL to determine justifiable reliance on an individual basis with respect to the UTPCPL "catch-all" provision. As discussed above, the Pennsylvania Superior Court has recently reiterated that

plaintiff need not plead justifiable reliance. *Baum*, 2677 EDA 2013 at pg. 12.  In any event, in the present case, unlike *Slapikas,* Plaintiffs allege RICO violations as well as UTPCPL violations.

### C. The Court Should Appoint Proposed Class Counsel.

When considering whether to appoint class counsel, courts consider "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions ...; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class."  Fed. Civ. P. 23(g)(1)(A) & (B).

Proposed Class counsel have the skills and resources to represent the proposed Class adequately, professionally and vigorously.  As discussed above, attorneys at the proposed law firms have extensive experience successfully litigating complex and class action cases.  Counsel have successfully pursued numerous class actions of similar scope and complexity from start to finish and have, collectively, secured hundreds of millions of dollars for class members.  The firms have already undertaken a lengthy, careful (and ongoing) investigation of the facts surrounding Defendant's misconduct and have already devoted a substantial amount of time and resources to advancing this action, reviewing documents produced and taking deposition discovery.

### IV. CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully requests that this Court grant Plaintiffs' Motion for Class Certification and appoint Plaintiffs as Class representatives and Berger & Montague, P.C. and Ann Miller, LLC as Class counsel.

Dated:  January 9, 2015

/s/ Todd S. Collins

**BERGER & MONTAGUE, P.C.**

Todd S. Collins

Shoshana Savett1622 Locust Street

Philadelphia, PA 19103-6305

Telephone (215) 875-3000

**ANN MILLER, LLC**

Ann Miller

261 Old York Road, Suite 524

Jenkintown, PA 19046

Telephone (215) 238-0468

**THE LAW OFFICES OF DANIEL HARRIS**

Daniel Harris (Admitted Pro Hac Vice)

150 N. Wacker Drive, Suite 3000

Chicago, IL 60606

Telephone: (312) 960-1802

kal6912931_920_1.docx

36

**CERTIFICATE OF SERVICE**

I certify that the attached Plaintiffs' Motion for Class Certification along with supporting papers was served on the counsel below by the ECF system on January 9, 2015.

Lauren P. McKenna
Robert S. Tintner
Beth L. Weisser
**Fox Rothschild LLP**
2000 Market Street, 10th Floor
Philadelphia, PA 19103
lmckenna@foxrothschild.com
rtintner@foxrothschild.com
bweisser@foxrothschild.com

Elizabeth Teutenberg Ferrick
Dentons US LLP
One Metropolitan Square
211 N. Broadway
Suite 3000
St. Louis, MO  63102-2741
Elizabeth.ferrick@dentons.com

Richard L. Fenton
Corey M. Shapiro
Dentons US LLP
233 South Wacker Drive, Suite 7800
Chicago, IL  60606
Richard.fenton@dentons.com
Corey.shapiro@dentons.com

Sonia Martin, Esq.
Bonnie Lau, Esq.
Dentons US LLP
525 Market Street
26th Floor
San Francisco, CA  94105-2708
Sonia.martin@dentons.com
Bonnie.lau@dentons.com

/s/Todd S. Collins
TODD S. COLLINS